IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | 4:01CR3106 |
| | ) | |
| Plaintiff, | ) | **MEMORANDUM** |
| vs. | ) | **AND ORDER** |
| | ) | |
| JOHN E. DAVIS, | ) | |
| | ) | |
| Defendant. | ) | |

The defendant, John E. Davis, has filed a motion for new trial based on newly discovered evidence. Davis asserts that two former co-defendants, Brian Robson and Mary Negethon, both of whom pleaded guilty to conspiracy to distribute and possess with intent to distribute 500 grams or more of methamphetamine, as charged in Count I of the superseding indictment, lied about Davis's involvement in the conspiracy while giving testimony as cooperating witnesses for the government at Davis's trial. Davis also asserts that Negethon falsely testified about Davis's use of a firearm, as charged in Count III of the superseding indictment, and he contends that a recent investigator's report shows that his alleged shooting at a car driven by Negethon's brother, Mark Osborn, could not have happened in the manner that was described by Negethon and other witnesses.[1]

Upon careful review of the record[2] and the parties' briefs, I find no basis for granting the motion for new trial. Davis relies primarily upon an affidavit signed by a federal prisoner, Gary Bovee, in December 2005, in which Bovee claims that he was

---

[1] Count II of the superseding indictment charged Davis with using force or threatening Osborn to prevent his testimony.

[2] In addition to considering the exhibits that have been filed by the parties with reference to the pending motion (see filings 395, 399, and 400), I have taken judicial notice of all trial evidence and all evidence received at sentencing.

recruited by Robson and Negethon to corroborate their false testimony, and that he lied during a proffer interview by stating that he "used Robson and Negethon to purchase four pounds of methamphetamine from Davis over a five month period and that Davis admitted to me that he shot Osborn's car." This affidavit is not credible because Bovee, who did not testify at trial, previously disavowed a similar statement written in April 2003 by claiming that Davis had threatened to kill him if he did not write it. In any event, Bovee's affidavit merely impeaches Robson's and Negethon's testimony; also, considering all of the other evidence of Davis's guilt, it is not likely that Bovee's testimony at a new trial would produce an acquittal. The investigator's report likewise is merely impeaching or cumulative, and is of no consequence. The particulars of the shooting incident, including where Davis fired the shots from and whether any of the shots hit the car, are largely immaterial. For these reasons, and for the reasons that are discussed in more detail below, Davis's motion for new trial will be denied.

## *I. Background*

Davis, Robson, and Negethon, together with Donald W. Cramer, were charged on September 18, 2001, with one count of conspiracy to distribute and possess with intent to distribute 500 grams or more of methamphetamine. The indictment also charged Davis with tampering with a witness (Osborn) and with using or carrying a firearm during and in relation to a drug trafficking crime (i.e., the conspiracy charged in Count I) or a crime of violence (i.e., the crime of tampering with a witness charged in Count II). In a superseding indictment filed on June 19, 2002, Garet J. Peters and Tracy J. Schmeichel were added as co-defendants to the conspiracy charge.

On November 22, 2002, the case proceeded to trial against Davis and Cramer only, the other defendants having previously pleaded guilty.[3] The jury returned its

---

[3] Peters and Schmeichel each pleaded guilty to an information charging them with conspiracy to distribute and possess with intent to distribute 50 grams or more of methamphetamine.

verdict on December 9, 2002, finding Davis guilty as charged on all three counts and finding Cramer guilty of conspiracy involving a lesser drug quantity. On March 6, 2003, I sentenced Davis to life imprisonment for Counts I and II, and imposed a consecutive 10-year sentence for Count III.

Davis's conviction and sentence were affirmed on appeal, but the Eighth Circuit's mandate was recalled on March 4, 2005, after the Supreme Court granted Davis's pro se petition for writ of certiorari and remanded for further consideration in light of United States v. Booker, 543 U.S. 220 (2005). The case remains pending before the Eighth Circuit.[4]

Davis states in his affidavit that he met an individual named Daniel Tolbridge while both men were jailed in Holton, Kansas, in March 2003. This individual allegedly told Davis that during a van trip between correctional institutions he heard Negethon coercing and coaching Bovee to give false testimony about Davis. (Filing 395 at 23, ¶ 2.) "Specifically, that Negethon wanted Bovee to corroborate her and Brian Robson's testimony at trial." (Id.)

According to John Winkler, an investigator hired by Davis, "Daniel Tolbridge" actually is David Trowbridge. Winkler interviewed Trowbridge on December 5, 2005. Trowbridge told the investigator that he was in a marshal's van with Robson, Negethon, and Bovee, but stated that he heard only flirting between Negethon and Bovee. He denied hearing any talk of a conspiracy to testify falsely against Davis. (Filing 395 at 27-28.)

---

[4] Although district courts are prohibited from granting a motion for a new trial while an appeal is pending, they are not prohibited from denying such a motion or from certifying an intention to grant the motion to the court of appeals, which can then entertain a motion to remand the case. United States v. Reeves, 83 F.3d 203, 208 (8th Cir. 1996).

Winkler also reports that he went to Davis's former residence on July 24, 2005, and stood on the front porch. He opines that only one of four bullet holes found in the rear of Osborn's car could have resulted from a gunshot fired from the porch, where the shooting allegedly took place, and that the other three holes could only have been made by shots fired from the road. (Filing 395 at 28.) Winkler also states that Osborn could not have been hit in the right leg by bullet fragments as he claimed because only one shot penetrated the car, and the bullet fragment was found in a speaker located inside the trunk. (Id.) Ballistic tests on that bullet fragment were inconclusive. (Id.) Winkler concludes by stating, "Simply put the shooting could not have happened as witnesses described." (Id.)

Davis says that he encountered Bovee a few weeks after his conversation with Trowbridge, and that Bovee admitted to him that he had lied about Davis during a proffer interview.[5] Thus, Davis states in his affidavit:

> On or about April 20, 2003, I learned that Gary Bovee was housed in my unit at FCI Pekin. I then went to Bovee's cell to talk to him. Bovee admitted that he lied in his proffer to the U.S. Attorney's office and that he did not even know me previous to this meeting. Bovee also claimed that my co-defendants, Mary Negethon and Brian Robson offered him money in exchange for testimony corroborating their lies. I attempted to obtain an affidavit from Bovee but was unsuccessful.

(Filing 395 at 23, ¶ 3.)

Shortly after this encounter, however, Bovee wrote three separate letters to his attorney, the prosecutor, and the court, complaining that Davis had been placed in the same institution and stating that Davis had threatened to kill him if he did not write

---

[5] Bovee and seven other persons were indicted on June 20, 2001, for conspiracy to distribute and possess with intent to distribute methamphetamine. Bovee pleaded guilty and on September 6, 2002, was sentenced by me to 180 months' imprisonment. He was delivered to FCI Pekin on January 30, 2003. See United States v. Bovee, et al., Case No. 4:01CR148 (filing 361).

-4-

and sign a statement that Davis dictated. According to these letters, Bovee notified prison officials immediately after his meeting with Davis, when Bovee was supposed to be getting the statement notarized, and he was placed in administrative detention for his own protection.

Bovee's letter to the court, which was received in my chambers on April 30, 2003, included a copy of an administrative detention order that was issued at 10:30 a.m. on April 21, 2003, showing that Bovee was placed in administrative detention at his request pending a protective custody investigation. (Exhibit F (filing 400-7) at 7.) As explained by Bovee in his letter:

> I writting to you because of the trouble im in up here in Pekin Ill F.C.I. Sir i was told by my lawyer and the District Attorney that i should Proffer. So i did on John Davis.
> Well. Sir notthing happen over this matter i came to proffer. And i was told they didn't need me to testify in court. So i was send here
> Now last week John Davis come here. And they put him two door down from me. Well Sir this Man got life plus 10 years. for all of this.
> Well Monday the 4-21-03 at 830 or 930 AM he came to my room and told me that if i didnt write a letter for him. That my life would be in great - Danger Well Sir im not the Smatest man in the world. But i sure know what he mean's. This John - Davis was going to kill me if i didnt do what i was told to. So i wrote the letter and he and i sign it. And then i was to go and get this Notoriaus so he could send this to his lawyer. So i said i would go do this. And then i went to the Lt. office and told them what was going on so put me in the hole for protection.. . .

(Id. at 2 (spelling and punctuation as in original).) Upon receiving this letter, I requested the United States Marshal and the Bureau of Prisons to investigate and to take appropriate action for Bovee's protection. (Id. at 1.)

In the letter to his attorney, copies of which were enclosed in the letters to the court and the prosecutor, Bovee stated:

-5-

> I have been having a lot of trouble up here in Pekin Ill.  You see last week John Davis came in to my unit and they put him two room from mind.  And then all hell broke lous.  John and some people came at me.  And said if i don't write what he tell me to.  So him and his lawyer could have a letter. stated. What the letter say. Then John would kill me.   This was on Monday around 830 or 930 AM.  So i wrote to letter and we sign it together and then John told me to go and get it notarized. So he could send it to his lawyer.  So i said i would and walk out of the unit. and told the C/O standing out side. that i had to see a Lieutenant.  So i went to the Lieutenant offices. And told them what was going on.  So i was put on Administrative Detention. . . .

(Id. at 8; Exhibit D (filing 400-5) at 4 (spelling and punctuation as in original).)

In the letter to the prosecutor, which also appears to have been received on April 30, 2003, Bovee stated:

> . . . John came to my room and had a little talk with me.  About me Brian Mary & Mark and he said that someday he will get Brian & Mark and if i didnt write a letter for him.  To send to his lawyer that i would be the first to go.  So i wrote what he said.  And said i would go get the letter notarize.  So i walk out of the unit with this letter that John & and sign.  And went to the Lt office.  And told them what was going on.  So i had to check in to the hole for my life. . . .

(Exhibit D (filing 400-5) at 1 (spelling and punctuation as in original).)

Copies of the signed statement are enclosed with the letters, including one on which Bovee has written: "All of this is a lie.  I just wrote this so John would let me go." (Exhibit D (filing 400-5) at 6.)  The statement reads:

> I Gary L Bovee on 4-21-03 and John Davis are in my room ILL 1 = 244.  And we are talking about Brain Rodson & Mary Negethon. because they had me proffer with them. against John Davis they told me everything about John case. So could help them get John.  I was given $1000.00 to help get John. because they don't want to do this time that they got.  They want to put this all on John Davis to help there self.  And Traci

> Abbot would do the same thing. And Mark Osborn. Was all in on this against John Davis. They are came up with this intransit. And i got letters from Mary & Brian about John.
>
> > s/ Gary L. Bovee 4-21-03
> > s/ John E. Davis 4-21-03

(Id.; Exhibit F (filing 400-7) at 6 (spelling and punctuation as in original).)

Bovee signed an affidavit on December 8, 2005 (filing 395 at 19-21), and again on December 16, 2005, before a notary public (filing 399), in which he states that he first became acquainted with Robson while incarcerated at the CCA Leavenworth Detention Center and while being held at the Sarpy County Jail, and first became acquainted with Negethon while being transferred between CCA Leavenworth, the Dawson County Jail, and the federal district court. (Id., ¶¶ 3-4.) The affidavit continues with Bovee stating:

> I was not familiar with Mr. John Davis [hereinafter Davis] until I was approached by Robson in the Sarpy County jail. Specifically, after becoming friendly with Robson, he asked me to corroborate his upcoming testimony against Davis. Robson wanted me to proffer against Davis by increasing the methamphetamine amounts accountable to Davis under their conspiracy. Robson explained that he and Davis had only bought small amounts of methamphetamine, but that if I would help him collaborate (sic) an increased amount, his chances of receiving a reduced sentence from the Government would increase. Robson also told me that if I could get the Government to believe my story, I could receive a "cooperating agreement."
>
> Negethon, also requested that I help corroborate both her and Robson's story. This occurred on a transport from CCA Leavenworth to the United States District Court, Lincoln, Nebraska. During this trip, Negethon spent approximately four hours explaining the details I would need to know in order to collaborate (sic) the story: Davis' full name; where Davis lived; what type of car he drove; the appearance of the inside and outside of his house; when Robson and Negethon dealt with

> Davis; shooting incident with Negethon's brother, Mark Osborn [hereinafter Osborn]; what drug amounts they wanted me to allege....
>
> With the facts provided to me by Negethon and Robson, I conducted a Proffer Interview with Nebraska State Patrol Investigator David Hanselman. At this proffer, I collaborated (sic) the increased drug amounts and acts of violence Robson and Negethon asked me to lie about. Specifically, that I used Robson and Negethon to purchase four pounds of methamphetamine from Davis over a five month period and that Davis admitted to be that he shot Osborn's car.
>
> Outside of prison, I was never acquainted with Mr. Davis. At no time did I ever engage in any illegal activity with Mr. Davis. At no time did I ever witness Mr. Davis engage in illegal activity. I never even traveled to Robson, Negethon and Davis' town of (sic) York County, Nebraska. As stated above, Robson and Negethon convinced me to collaborate (sic) their lies in order to make them more believable and more likely to receive a reduced sentence from the Government.

(Id., ¶¶ 5-8.) Bovee does not explain how this affidavit came about, and there is no retraction of his earlier claims that Davis threatened to kill him. Nor is there any other evidence showing the circumstances under which this affidavit was prepared and executed. In particular, Davis's affidavit is silent regarding any further contact that he or his representatives may have had with Bovee after April 2003.

## *II. Discussion*

Motions for a new trial based on newly discovered evidence "are looked upon with disfavor." United States v. Liebo, 923 F.2d 1308, 1313 (8th Cir. 1991) (quoting United States v. Gustafson, 728 F.2d 1078, 1084 (8th Cir 1984)).

> Five pre-requisites must be met in order to justify a new trial based upon newly discovered evidence: "(1) the evidence must in fact be newly discovered, that is, discovered since the trial; (2) facts must be alleged from which the court may infer diligence on the part of the movant; (3) the evidence relied upon must not be merely cumulative or

> impeaching; (4) it must be material to the issues involved; and (5) it must be of such nature that, on a new trial, the newly discovered evidence would probably produce an acquittal."

United States v. Womack, 191 F.3d 879, 886 (8th Cir. 1999) (quoting United States v. Luna, 94 F.3d 1156, 1161 (8th Cir.1996). Newly discovered evidence that is not credible is not likely to result in acquittal in a second trial, and therefore lack of credibility is sufficient grounds for denying a motion for a new trial. United States v. Vazquez-Garcia, 340 F.3d 632, 641 (8th Cir. 2003), cert. denied, 540 U.S. 1168 (2004).

Davis argues that his motion for new trial should be judged by a more lenient standard that applies when the government has knowingly, recklessly, or negligently used false testimony, and that he should only be required to show "any reasonable likelihood that the false testimony could have affected the judgment of the jury." See United States v. Tierney, 947 F.2d 845, 860-61 (8th Cir. 1991) (quoting United States v. Agurs, 427 U.S. 97, 103 (1976)). Davis, however, has failed to show that there was any prosecutorial misconduct in the handling of his case. Davis only argues that the prosecutor should have known that Robson's and Negethon's testimony was untruthful because

> . . . both parties testified pursuant to a "cooperating agreement." Robson admittedly used methamphetamine for over a decade and had been arrested several times. [Tr. 1699-1700]. Robson was bi-polar and was using powerful psychiatric medication at the time of his testimony. [Tr. 1618-1620]. Robson even admitted a long history of lying.[6] [Tr. 1700-1704]. Negethon also admitted to being an addict of methamphetamine. [Tr. 1864]. Negethon admitted that she had lied to police regarding Defendant's case.[7] [Tr. 1949]. Negethon even obtained a

---

[6] Robson testified that he lied about using and selling methamphetamine.

[7] Negethon testified that she originally told police that Davis did not shoot at Osborn's car, but after being informed that the car had bullet holes in it, admitted that she had witnessed the shooting.

      signed statement from her brother, Osborn, which she later testified was a lie.[8] [Tr. 1926-28].

(Filing 395 at 13.) These facts, all of which were made known to the jury, do not indicate that Robson and Negethon provided any false testimony — at best, they indicate that these witnesses had an incentive or a propensity to lie, but this is hardly unusual in a case of this type. (Indeed, the jury was specifically instructed to consider factors such as these in deciding whether to believe the witnesses and how much weight to give their testimony. See Instruction No. 5 (filing 194 at 6).)

      Nor is there any other credible evidence to establish that Robson and Negethon provided false testimony. Bovee's unexplained affidavit has no probative value after his complete disavowal of the earlier written statement, and Davis's other potential new witness, Trowbridge, has likewise denied making the statements that Davis has attributed to him.[9] Also, as will be discussed subsequently, Winkler's report does not establish that Negethon or others provided false testimony regarding the shooting incident. Thus, even if the <u>Tierney</u> standard might be applied in this case, Davis has not provided the requisite degree of evidence for granting a new trial.

      Judged by the usual five-part standard, Bovee's affidavit does not satisfy either the third or the fifth prerequisite for granting a new trial. The affidavit fails the third prerequisite because it merely impeaches Robson's and Negethon's testimony. It fails the fifth prerequisite because, first of all, the affidavit is not credible given Bovee's claims that he previously was threatened by Davis to make a similar statement that was not true, and, secondly, there is substantial evidence of Davis's guilt, making it unlikely that the information contained in the affidavit, even if believed, would result in an acquittal on a new trial. The trial testimony concerning methamphetamine quantities attributable to Davis is summarized below.

---

[8] Negethon testified that the false statement was prepared pursuant to Davis's direct instructions.

[9] These statements, of course, are inadmissible hearsay.

Glen Groomes testified that he sold a total of six ounces of methamphetamine to Davis. The methamphetamine was fronted to Davis, but he failed to pay. Some of the methamphetamine went through Negethon to Davis. (Tr. 318:9-320:15.) Groomes also bought ⅛-ounce quantities of methamphetamine from Davis on two occasions at Davis's house. (Tr. 323:13-324:13.)

James Smith testified that he started buying methamphetamine from Davis about six months prior to making a wired buy from Davis for the Nebraska State Patrol. He bought methamphetamine from Davis in quantities ranging from ¼ gram to ½ ounce at a time. (Tr. 419:9-420:25.) Smith said that on one occasion, he saw Davis take a smaller quantity that he was buying out of a larger three to four-ounce quantity in Davis's basement. On another occasion, he saw Davis take three or four ⅛-ounce quantities out of a shoe box in the pole building. (Tr. 434:18-436:11.) Smith said that he told Davis that he was reselling some of the methamphetamine he purchased, and Davis was fronting methamphetamine to him. (Tr. 433:7-434:15.) Smith said that on one occasion, he met Robson at Davis's house. They went to a trailer in Grand Island, and Robson came out with two to three ounces of methamphetamine. They then returned to Davis's house. (Tr. 424:17-427:4).

Edgar Anderson testified that he and Davis made three trips to a place that Robson and his girlfriend, Mary Buggi, had near the Platte River and obtained a total of four ounces of methamphetamine together. They would split the methamphetamine obtained between them. Garet Peters put in money on the purchases. Negethon went along on two trips. (Tr. 483:22-485:17; 485:18-486:23; 488:6-492:22.)

After developing a different source, Anderson said he sold at least one ounce of methamphetamine per week to Davis between January and April of 2000. (Tr. 514:7-11; 514:23-515:11.) Beginning in the fall of 2000, Anderson said he obtained ⅛ ounce of methamphetamine fronted to him by Davis nearly every day. Anderson said that on more than one occasion, he saw Davis take his ⅛-ounce quantities out

of a bag with several additional ⅛-ounce quantities inside. On at least one occasion, Anderson said he saw Davis cut his ⅛-ounce quantity off of a one-ounce rock of methamphetamine. (Tr. 523:14-525:18.)

Christy Stairs testified that in October of 2000, she went to Grand Island with Davis and Robson. She said Robson went into a residence and came out with two packages of methamphetamine that were the size of house bricks. The three of them did some of the methamphetamine together. When they got back to Davis's house, Davis and Robson went downstairs. (Tr. 772:5-776:1.)

In early November of 2000, Stairs made a second trip to Grand Island with Robson and they brought back another brick of methamphetamine. Davis provided money to Robson prior to them leaving for Grand Island. Stairs said that Davis and Robson would split the methamphetamine obtained between them. She described them as partners. (Tr. 778:10-783:12.)

Stairs made a third trip to Grand Island with Robson prior to Thanksgiving in 2000. On that trip, Robson brought back three bricks of methamphetamine. (Tr. 795:11-797:3.) Stairs lived at Davis's residence between October and December 6, 2000. During that time, Robson made three or four other trips to Grand Island without her. Stairs said she saw Robson come back to Davis's residence with three or four bricks that were half the size of the other bricks she had seen. (Tr. 810:21-815:4.)

Mark Osborn said that he successfully cooked methamphetamine with Davis on three occasions. Each time they produce ¾ ounce of methamphetamine. (Tr. 915:12-916:20.)

Garet Peters testified that between 1998 and the spring of 2001, he purchased an estimated fifty ⅛-ounce quantities of methamphetamine from Davis, occasionally

buying two ⅛-ounce quantities at a time. On a couple of occasions, he purchased ½-ounce quantities. (Tr. 1480:8-1484:9.) Peters said that on one occasion, he saw Davis break his purchase off of a chunk of methamphetamine that he described as half the size of a bread pan. On four or five occasions Peters also saw Davis in possession of chunks of methamphetamine that were the size of golf balls. He estimated that these golf ball-size chunks weighed one ounce each. (Tr. 1491:4-1494:8). Peters also saw Davis throw an estimated ½-ounce package to Donald Cramer (Hawk) on one occasion. (Tr. 1496:3-1497:21).

Robson testified that there were at least two one-ounce transactions at the Platte River and at least two one-ounce transactions in Columbus with Mary Buggi. (Tr. 1623:23-1625:16; 1626:3-1627:16). With respect to trips to Grand Island, Robson testified that he got methamphetamine from a guy he worked with eight to ten times in quantities ranging from one to three-and-one-half ounces. Robson said that the methamphetamine and the cost of the methamphetamine were split 50-50 with Davis. (Tr. 1629:11-1632:21; 1633:7-1634:7.)

Robson said that he and Davis then obtained methamphetamine from "Hector" for about eight months, starting with two-ounce quantities and progressing up to half-pounds, pounds, and on one occasion, two pounds. (Tr. 1636:5-7; 1637:1-1642:14.) Again, these amounts were split 50-50 with Davis. (Tr. 1643:5-17.) Robson said they got one-pound quantities four to six times. (Tr. 1644:2-7.) He said the methamphetamine looked like it had been formed in a rectangular pie pan or something that banana bread would be baked in. (Tr. 1644:8-1645:25.)

Negethon testified that on one occasion she saw Davis come back from Grand Island with a ½-pound brick. She knew the brick weighed ½ pound, because they weighed it together. (Tr. 1846:6-1847:24.) Negethon said the most she saw Davis with at one time was the ½-pound or slightly more than ½-pound brick. (Tr. 1854:17-20.) She said that Robson dropped off methamphetamine at Davis's house, but she did not see the quantities. (Tr. 1849:16-1850:11.) She heard Davis and

Robson talk about getting one to two bricks at a time. (Tr. 1854:24-1855:6.) She said that Davis and Robson were each supposed to get eight ounces from the pound, but she said that Davis's brick weighed out at 8.9 ounces. She understood that Davis and Robson had obtained slightly over one pound together on that occasion. (Tr. 1855:7-1856:12.)

Negethon also saw Davis in possession of two ounces on a daily basis for a couple of months and saw two ounces in a box in the shop. (Tr. 1851:22-1854:14). After Negethon bonded out in December of 2000, Davis told her the State Patrol had missed two ounces in the search of the shop. (Tr. 1903:8-1904:20.)

Even discounting Robson's and Negethon's testimony, there is sufficient evidence to support the jury's finding that Davis was responsible for 500 grams or more of the methamphetamine that was involved in the conspiracy. To the extent Davis argues that an excessive sentence was imposed based upon the court's own finding that Davis was responsible for approximately 10 kilograms of methamphetamine, such argument is irrelevant to the pending motion for new trial. See United States v. Freeman, 942 F.2d 480, 483 (8th Cir. 1991) (newly discovered evidence must be of such a nature that, on a new trial, it would probably produce an acquittal; recent decision of Court of Appeals regarding computation of amount of marijuana for purposes of sentencing was not "newly discovered evidence" entitling defendant to a new trial because it did not render any trial evidence inadmissible and would not result in an acquittal). If Davis wishes to make such an argument, he should file a motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255.[10]

Regarding Winkler's report, even if it might be considered newly discovered evidence, there is no support for his conclusion that "the shooting could not have happened as witnesses described." The investigator apparently believed that the

---

[10] A § 2255 motion is subject to certain procedural limitations, however, including a 1-year statute of limitations, that may preclude the court's consideration of such an argument.

witnesses said the shooting only took place on the front porch of Davis's house, but this is not what was testified to at trial. Negethon testified that she was inside the house during the shooting; that she heard three or four shots while standing in the kitchen; and that she then went to the door and saw the last shot hit two feet behind the car. (Tr. 1917;1-21.) Negethon did not testify that Davis was only shooting from the front porch. In fact, she specifically stated that she could not see where Davis was when she heard the first shots, but her perception was that he was on the side of the house. (Tr. 1984:3-16.) Osborn only testified that he saw Davis "coming down the steps from his front door of his house" and then raise a gun and fire shots at Osborn's car. (Tr. 949:11-15.) Another witness to the shooting, Lawrence Hilliman testified that he followed Davis outside and saw him fire two shots behind the car from one side of the house and then walk to the other side of the house, where he fired one more shot behind the car. (Tr. 1599:14-1600:13.) Davis himself effectively admitted to Sheriff Radcliff that he had fired shots in the direction of Osborn's car. (Tr. 1142:12-1143:1; 1149:5-8). Whether any shots actually hit the car is immaterial to the criminal charges upon which Davis was convicted.

Winkler further concludes that Osborn could not have been struck in the leg by a bullet fragment, but this opinion, even if it might be shown to be admissible, also is not inconsistent with the trial testimony. Osborn merely testified that he felt a burn on his leg while Davis was shooting at him, but "didn't pay any attention to it really," and admitted that the burn could have been caused by a cigarette. (Tr. 954:4-18.)

### *III. Conclusion*

Absent exceptional circumstances, a motion for new trial based on newly discovered evidence may be decided on affidavits without a hearing. United States v. Dogskin, 265 F.3d 682, 687 (8th Cir. 2001). No exceptional circumstances exist in this case, and Davis's affidavits fail as a matter of law to establish his entitlement to a new trial. The alleged "newly discovered evidence" is merely impeaching or cumulative in nature and would not likely result in an acquittal.

Accordingly,

IT IS ORDERED that Defendant's motion for new trial (filing 395) is denied. For the information of the panel considering this case (see page 3 and footnote 4), the clerk of our court shall provide a copy of this memorandum and order to the Clerk of the United States Court of Appeals for the Eighth Circuit.

January 9, 2006.                    BY THE COURT:

                                                                                                                s/ *Richard G. Kopf*
                                                                                                                 United States District Judge