IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | 4:01CR3106-1 |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| JOHN E. DAVIS, | ) | |
| | ) | |
| Defendant. | ) | |

 This matter is before the court for initial review of a motion under 28 U.S.C. § 2255 to vacate, set aside or correct the sentence of the defendant, John E. Davis (filing 451).[1] Davis is serving a life sentence for conspiracy to distribute 500 grams or more of methamphetamine and for witness tampering, plus a consecutive term of 10 years for discharging a firearm in connection with the other crimes.

 Davis claims (1) that he received ineffective assistance of counsel regarding the witness tampering and firearm counts because his attorneys did not conduct an adequate investigation and failed to present available evidence; (2) that he received ineffective assistance of counsel because his attorneys did not adequately object to the drug quantity that was attributed to Davis at sentencing; (3) that the drug quantity

---

[1] Rule 4(b) of the *Rules Governing Section 2255 Proceedings for the United States District Courts* provides:

>  The judge who receives the motion must promptly examine it. If it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the judge must dismiss the motion and direct the clerk to notify the moving party. If the motion is not dismissed, the judge must order the United States attorney to file an answer, motion, or other response within a fixed time, or to take other action the judge may order.

was based on unreliable testimony, and Davis's sentence was improperly enhanced for his role in the offense and for obstruction of justice based on unreliable testimony; (4) that the court did not give proper consideration to all sentencing factors and failed to provide an adequate statement of reasons for the sentence imposed; (5) that a life sentence was imposed in violation of the Sixth Amendment because the jury was not asked to determine a precise drug quantity, Davis's role in the offense, or whether he obstructed justice; and (6) that he received ineffective assistance of counsel because the Sixth Amendment claim was not raised on appeal. Because it plainly appears that all of these claims are without merit, Davis's § 2255 motion will be denied.

## I. BACKGROUND

Davis, together with Brian Robson, Mary Negethon, and Donald W. Cramer, were charged on September 18, 2001, with one count of conspiracy to distribute and possess with intent to distribute 500 grams or more of methamphetamine. The indictment also charged Davis with tampering with a witness (Mark Osborn) and with using or carrying a firearm during and in relation to a drug trafficking crime (*i.e.*, the conspiracy charged in Count I) or a crime of violence (*i.e.*, the crime of tampering with a witness charged in Count II). In a superseding indictment filed on June 19, 2002, Garet J. Peters and Tracy J. Schmeichel were added as co-defendants to the conspiracy charge.

On November 22, 2002, the case proceeded to trial against Davis and Cramer only, the other defendants having previously pleaded guilty.[2] The jury returned its verdict on December 9, 2002, finding Davis guilty as charged on all three counts and finding Cramer guilty of conspiracy involving a lesser drug quantity. On March 6,

---

[2] Peters and Schmeichel each pleaded guilty to an information charging them with conspiracy to distribute and possess with intent to distribute 50 grams or more of methamphetamine.

2003, I sentenced Davis to life imprisonment for Counts I and II, and imposed a consecutive 10-year sentence for Count III.

Davis's conviction and sentence were affirmed by the United States Court of Appeals for the Eighth Circuit on February 2, 2004, but almost one year later, on January 24, 2005, the United States Supreme Court granted Davis's petition for writ of certiorari,[3] vacated the judgment, and remanded the case to the Eighth Circuit for further consideration in light of *United States v. Booker*, 543 U.S. 220 (2005). On March 30, 2006, the Eighth Circuit reinstated its previous opinion and reaffirmed Davis's conviction and sentence. A second petition for writ of certiorari was denied by the Supreme Court on October 10, 2006.[4] Davis has declared under penalty of perjury that the pending § 2255 motion (which the clerk of the court received on October 15, 2007) was deposited in the prison's mail system, with postage prepaid, on October 9, 2007. The motion thus appears to be timely.[5]

Davis argued on appeal that "the jury's verdict as to the conspiracy charge was not supported by sufficient evidence because much of the evidence came from cooperating witnesses." *United States v. Davis*, 357 F.3d 726, 728 (8th Cir. 2004), *cert. granted, judgment vacated by* 543 U.S. 1099 (2005), *opinion reinstated on remand by* 442 F.3d 681 (8th Cir. 2006). The Court of Appeals rejected this

---

[3] The petition for writ of certiorari was filed on June 2, 2004, within ninety days after the denial of Davis's petition for rehearing.

[4] The second petition was filed on August 29, 2006, within ninety days after the denial of Davis's petition for rehearing.

[5] Rule 3(d) of the *Rules Governing Section 2255 Proceedings for the United States District Courts* provides, in part, that "[a] paper filed by an inmate confined in an institution is timely if deposited in the institution's internal mailing system on or before the last day for filing." The last day for filing the § 2255 motion presumably was October 10, 2007, one year after the Supreme Court denied the second petition for writ of certiorari.

3

argument by stating: "As we have held in similar cases, the testimony of cooperating witnesses more than suffices to sustain a conviction for conspiracy to distribute methamphetamine, and any question as to the credibility of the cooperating witnesses is for the jury alone to determine. In this case, much of the physical and documentary evidence presented to the jury corroborated the cooperating witnesses' testimony. Thus, there was more than sufficient evidence to convict Davis on the conspiracy charge." *Id.* (internal quotations and citations omitted).

Davis also argued on appeal that his life sentence was excessive under the Sentencing Guidelines, to which the Court of Appeals responded:

Davis raises three arguments challenging the district court's determination of his sentence under the Sentencing Guidelines. First, Davis argues that the district court erred in imposing a two-level enhancement for obstruction of justice pursuant to U.S.S.G. § 3C1.1. We conclude that the district court did not clearly err in finding that Davis's threats and acts of violence against Mark Osborn, Margie Smith, James Smith, and Joanne Winter were calculated to impede a criminal investigation and therefore constituted an obstruction of justice.

Second, Davis argues that the district court erred in imposing a four-level aggravating role enhancement under U.S.S.G. § 3B1.1(a). Because the evidence shows that Davis directed the activities of at least one other coconspirator, Mary Negethon, and exercised control over other coconspirators through threats or violence, the district court did not clearly err in concluding that Davis was a leader or organizer of the conspiracy. We affirm the district court's imposition of the four-level enhancement.

Third, Davis argues that the district court erred in relying upon the testimony of cooperating witnesses to calculate the amount of drugs involved in the conspiracy. We give great deference to the district court's evaluation of witness credibility and its calculation of drug quantity. Because the testimony of the witnesses believed by the court to be credible is sufficient to support the district court's determination

4

that Davis was responsible for a minimum of 10 kilograms of methamphetamine, we see no clear error in the district court's findings, and we affirm its calculation of the base offense level.

*Id.* at 729 (internal quotations and citations omitted).

On remand from the Supreme Court, the Eighth Circuit determined that Davis had failed to preserve a *Booker* claim, and, reviewing for plain error, held that Davis could not establish a reasonable probability that he would have received a more favorable sentence if I had considered the Sentencing Guidelines as being advisory rather than mandatory. It stated:

Davis was convicted by a jury of conspiracy to distribute 500 grams or more of methamphetamine, tampering with a witness, and discharging a firearm during the commission of a drug offense. In preparing the Presentence Investigation Report (PSR), the probation officer attributed 9.56 kilograms of methamphetamine to Davis, resulting in a base offense level of 36. Davis objected to the PSR's drug quantity, arguing that "[t]he witnesses called by the AUSA provided contradictory testimony, and were motivated by a self-serving interest. Davis should not be punished beyond what the jury's verdict reaches, which would be 500 grams to 1500 grams." (Objection to PSR at 1.) At sentencing, Davis's attorney discussed the trial evidence concerning various drug transactions and whether they should be attributed to Davis, stating that "[e]ssentially, ... whether we believed Brian Robson [a coconspirator] is probably going to carry this issue." (Sent. Tr. at 2142.) Davis abandoned any reliance on the jury's quantity findings when, in response to the district court's query as to the quantity established by the record, Davis's attorney responded, "when I look through the records, the amounts that were verified by other individuals, I believe, is consistent with what Brian Robson got ..., 1.5 to 5 kilograms." (*Id.* at 2146-47.)

The argument that a *Booker* error occurred is preserved if the defendant below argued *Apprendi* [*v. New Jersey*, 530 U.S. 466 (2000)] or *Blakely* [*v. Washington*, 542 U.S. 296 (2004)] error or that the

5

Guidelines were unconstitutional.  Although Davis objected to the drug quantity contained in the PSR and stated that he should not be punished beyond what was established by the jury verdict, the premise of his jury limitation to the drug quantity was based on the questionable nature of the evidence offered by his coconspirators, not the unconstitutionality of allowing a district court to determine drug quantity by a preponderance of the evidence.  In his first appeal, "Davis argue[d] that the district court erred in relying upon the testimony of cooperating witnesses to calculate the amount of drugs involved in the conspiracy," 357 F.3d at 729, clearly a challenge to the sufficiency of the evidence of drug quantity.  Our *en banc* court has explicitly rejected objections to the sufficiency of the evidence as preserving *Booker* error.  Davis's objection was nothing more than a sufficiency-of-the-evidence argument, and it did not preserve a *Booker* claim. We therefore review his challenge for plain error.

While we now know that the district court understandably plainly erred in sentencing Davis based on judge-found facts under a mandatory sentencing regime, Davis has failed to meet his burden of establishing the third prong of the plain error analysis, that the error affected his substantial rights, which requires that he establish a reasonable probability, based on the appellate record as a whole, that but for the error he would have received a more favorable sentence.  Indeed, Davis admits that "the record is devoid of any suggestion that [the district court] would have imposed a more favorable sentence." (Appellant's Suppl. Br. at 7.)  In the first appeal, we affirmed the district court's calculation of the then-mandatory Guidelines range, which was 360 months to life, and Davis cannot quarrel with that calculation now; if this case were to be remanded, it would become the correct *advisory* Guidelines range.  Faced with that range, the district court sentenced Davis to life in prison, the top of the range.  Davis cannot establish that he would have received a more favorable sentence if the district court had sentenced him under an advisory scheme consistent with *Booker* when the district court, applying the Guidelines as mandatory, did not use what discretion it had to sentence him to a lower sentence within the properly-calculated Guidelines range.

*United States v. Davis*, 442 F.3d 681, 682-84 (8th Cir.), *cert. denied*, 127 S.Ct. 424 (2006) (internal quotations and citations omitted) (emphasis in original).

On December 9, 2005, while the case was on remand to the Court of Appeals, Davis filed a motion for new trial in this court, claiming that he had newly discovered evidence, in the form of an affidavit from a federal prisoner, Gary Bovee, to show that Brian Robson and Mary Negethon provided false testimony about his involvement in the conspiracy for the government at Davis's trial. Bovee, who did not testify at trial, stated in his affidavit that he was recruited by Robson and Negethon to corroborate their false testimony, and that he lied during a proffer interview when he indicated that he "used Robson and Negethon to purchase four pounds of methamphetamine from Davis over a five month period and that Davis admitted to me that he shot Osborn's car." Davis also claimed that an investigator's report established that his alleged shooting at a vehicle driven by Negethon's brother, Mark Osborn, could not have happened in the manner that was described by Negethon and other witnesses.

I denied the motion for new trial on January 9, 2006.[6] Although Davis filed an appeal from this ruling, the appeal was voluntarily dismissed on March 29, 2006. Because the pending § 2255 motion is similar in many respects to the motion for new trial, I will now quote at length from my January 9, 2006 memorandum opinion:

Davis states in his affidavit that he met an individual named Daniel Tolbridge while both men were jailed in Holton, Kansas, in March 2003. This individual allegedly told Davis that during a van trip between correctional institutions he heard Negethon coercing and

---

[6] Although district courts are prohibited from granting a motion for a new trial while an appeal is pending, they are not prohibited from denying such a motion or from certifying an intention to grant the motion to the court of appeals, which can then entertain a motion to remand the case. *United States v. Reeves*, 83 F.3d 203, 208 (8th Cir. 1996).

coaching Bovee to give false testimony about Davis. (Filing 395 at 23, ¶ 2.) "Specifically, that Negethon wanted Bovee to corroborate her and Brian Robson's testimony at trial." (Id.)

According to John Winkler, an investigator hired by Davis, "Daniel Tolbridge" actually is David Trowbridge. Winkler interviewed Trowbridge on December 5, 2005. Trowbridge told the investigator that he was in a marshal's van with Robson, Negethon, and Bovee, but stated that he heard only flirting between Negethon and Bovee. He denied hearing any talk of a conspiracy to testify falsely against Davis. (Filing 395 at 27-28.)[7]

Winkler also reports that he went to Davis's former residence on July 24, 2005, and stood on the front porch. He opines that only one of four bullet holes found in the rear of Osborn's car could have resulted from a gunshot fired from the porch, where the shooting allegedly took place, and that the other three holes could only have been made by shots fired from the road. (Filing 395 at 28.) Winkler also states that Osborn could not have been hit in the right leg by bullet fragments as he claimed because only one shot penetrated the car, and the bullet fragment was found in a speaker located inside the trunk. (Id.) Ballistic tests on that bullet fragment were inconclusive. (Id.) Winkler concludes by stating, "Simply put the shooting could not have happened as witnesses described." (Id.)

---

[7] In an affidavit dated September 10, 2007, that has been submitted in support of Davis's § 2255 motion, Winkler contradicts himself by stating that Towbridge told him on December 5, 2005, that "he heard Negethon and Robson plotting a conspiracy against John Davis involving Gary Bovee giving false testimony against John Davis saying he (Bovee) had purchased drugs from Davis. Trowbridge goes on to say that Negethon was flirting with Bovee during the entire trip and even offered him oral sex if he (Bovee) would go along with their plan." (Filing 451-2, Appendix E.) This affidavit is signed by Winkler under penalty of perjury but is not notarized. Because this document is inconsistent with Winkler's previously submitted report, dated December 6, 2005 (filing 395 at 27-28), I question its authenticity.

8

Davis says that he encountered Bovee a few weeks after his conversation with Trowbridge, and that Bovee admitted to him that he had lied about Davis during a proffer interview.[8]  Thus, Davis states in his affidavit:

> On or about April 20, 2003, I learned that Gary Bovee was housed in my unit at FCI Pekin.  I then went to Bovee's cell to talk to him.  Bovee admitted that he lied in his proffer to the U.S. Attorney's office and that he did not even know me previous to this meeting.  Bovee also claimed that my co-defendants, Mary Negethon and Brian Robson offered him money in exchange for testimony corroborating their lies.  I attempted to obtain an affidavit from Bovee but was unsuccessful.

(Filing 395 at 23, ¶ 3.)

Shortly after this encounter, however, Bovee wrote three separate letters to his attorney, the prosecutor, and the court, complaining that Davis had been placed in the same institution and stating that Davis had threatened to kill him if he did not write and sign a statement that Davis dictated.  According to these letters, Bovee notified prison officials immediately after his meeting with Davis, when Bovee was supposed to be getting the statement notarized, and he was placed in administrative detention for his own protection.

Bovee's letter to the court, which was received in my chambers on April 30, 2003, included a copy of an administrative detention order that was issued at 10:30 a.m. on April 21, 2003, showing that Bovee was placed in administrative detention at his request pending a protective

---

[8] Bovee and seven other persons were indicted on June 20, 2001, for conspiracy to distribute and possess with intent to distribute methamphetamine.  Bovee pleaded guilty and on September 6, 2002, was sentenced by me to 180 months' imprisonment.  He was delivered to FCI Pekin on January 30, 2003.  *See United States v. Bovee, et al.*, Case No. 4:01CR148 (filing 361).

9

custody investigation.  (Exhibit F (filing 400-7) at 7.)  As explained by
Bovee in his letter:

> I writting to you because of the trouble im in up here
> in Pekin Ill F.C.I.  Sir i was told by my lawyer and the
> District Attorney that i should Proffer.  So i did on John
> Davis.
>
> Well. Sir notthing happen over this matter i came to
> proffer.  And i was told they didn't need me to testify in
> court. So i was send here
>
> Now last week John Davis come here.  And they put
> him two door down from me.  Well Sir this Man got life
> plus 10 years. for all of this.
>
> Well Monday the 4-21-03 at 830 or 930 AM he came
> to my room and told me that if i didnt write a letter for him.
> That my life would be in great - Danger Well Sir im not the
> Smatest man in the world. But i sure know what he mean's.
> This John - Davis was going to kill me if i didnt do what i
> was told to.  So i wrote the letter and he and i sign it.  And
> then i was to go and get this Notoriaus so he could send
> this to his lawyer.  So i said i would go do this.  And then
> i went to the Lt. office and told them what was going on so
> put me in the hole for protection.. . .

(Id. at 2 (spelling and punctuation as in original).)  Upon receiving this
letter, I requested the United States Marshal and the Bureau of Prisons
to investigate and to take appropriate action for Bovee's protection.  (Id.
at 1.)

In the letter to his attorney, copies of which were enclosed in the
letters to the court and the prosecutor, Bovee stated:

> I have been having a lot of trouble up here in Pekin
> Ill.  You see last week John Davis came in to my unit and
> they put him two room from mind.  And then all hell broke
> lous.  John and some people came at me.  And said if i
> don't write what he tell me to.  So him and his lawyer

10

> could have a letter. stated. What the letter say. Then John
> would kill me.   This was on Monday around 830 or 930
> AM.  So i wrote to letter and we sign it together and then
> John told me to go and get it notarized. So he could send it
> to his lawyer.  So i said i would and walk out of the unit.
> and told the C/O standing out side. that i had to see a
> Lieutenant.  So i went to the Lieutenant offices. And told
> them what was going on.  So i was put on Administrative
> Detention. . . .

(Id. at 8; Exhibit D (filing 400-5) at 4 (spelling and punctuation as in original).)

In the letter to the prosecutor, which also appears to have been received on April 30, 2003, Bovee stated:

> . . . John came to my room and had a little talk with
> me.   About me Brian Mary & Mark and he said that
> someday he will get Brian & Mark and if i didnt write a
> letter for him.  To send to his lawyer that i would be the
> first to go.  So i wrote what he said.  And said i would go
> get the letter notarize.  So i walk out of the unit with this
> letter that John & and sign.  And went to the Lt office.
> And told them what was going on.  So i had to check in to
> the hole for my life. . . .

(Exhibit D (filing 400-5) at 1 (spelling and punctuation as in original).)

Copies of the signed statement are enclosed with the letters, including one on which Bovee has written: "All of this is a lie.  I just wrote this so John would let me go."  (Exhibit D (filing 400-5) at 6.) The statement reads:

> I Gary L Bovee on 4-21-03 and John Davis are in my room
> ILL 1 = 244. And we are talking about Brain Rodson &
> Mary Negethon. because they had me proffer with them.
> against John Davis they told me everything about John

case.  So could help them get John.  I was given $1000.00 to help get John. because they don't want to do this time that they got.  They want to put this all on John Davis to help there self.  And Traci Abbot would do the same thing.  And Mark Osborn.  Was all in on this against John Davis.  They are came up with this intransit.  And i got letters from Mary & Brian about John.

s/ Gary L. Bovee 4-21-03<br/>s/ John E. Davis 4-21-03

(Id.; Exhibit F (filing 400-7) at 6 (spelling and punctuation as in original).)

Bovee signed an affidavit on December 8, 2005 (filing 395 at 19-21), and again on December 16, 2005, before a notary public (filing 399), in which he states that he first became acquainted with Robson while incarcerated at the CCA Leavenworth Detention Center and while being held at the Sarpy County Jail, and first became acquainted with Negethon while being transferred between CCA Leavenworth, the Dawson County Jail, and the federal district court. (Id., ¶¶ 3-4.) The affidavit continues with Bovee stating:

I was not familiar with Mr. John Davis [hereinafter Davis] until I was approached by Robson in the Sarpy County jail. Specifically, after becoming friendly with Robson, he asked me to corroborate his upcoming testimony against Davis.  Robson wanted me to proffer against Davis by increasing the methamphetamine amounts accountable to Davis under their conspiracy.  Robson explained that he and Davis had only bought small amounts of methamphetamine, but that if I would help him collaborate (sic) an increased amount, his chances of receiving a reduced sentence from the Government would increase. Robson also told me that if I could get the Government to believe my story, I could receive a "cooperating agreement."

Negethon, also requested that I help corroborate both her and Robson's story. This occurred on a transport from CCA Leavenworth to the United States District Court, Lincoln, Nebraska. During this trip, Negethon spent approximately four hours explaining the details I would need to know in order to collaborate (sic) the story: Davis' full name; where Davis lived; what type of car he drove; the appearance of the inside and outside of his house; when Robson and Negethon dealt with Davis; shooting incident with Negethon's brother, Mark Osborn [hereinafter Osborn]; what drug amounts they wanted me to allege....

With the facts provided to me by Negethon and Robson, I conducted a Proffer Interview with Nebraska State Patrol Investigator David Hanselman. At this proffer, I collaborated (sic) the increased drug amounts and acts of violence Robson and Negethon asked me to lie about. Specifically, that I used Robson and Negethon to purchase four pounds of methamphetamine from Davis over a five month period and that Davis admitted to be that he shot Osborn's car.

Outside of prison, I was never acquainted with Mr. Davis. At no time did I ever engage in any illegal activity with Mr. Davis. At no time did I ever witness Mr. Davis engage in illegal activity. I never even traveled to Robson, Negethon and Davis' town of (sic) York County, Nebraska. As stated above, Robson and Negethon convinced me to collaborate (sic) their lies in order to make them more believable and more likely to receive a reduced sentence from the Government.

(Id., ¶¶ 5-8.) Bovee does not explain how this affidavit came about, and there is no retraction of his earlier claims that Davis threatened to kill him. Nor is there any other evidence showing the circumstances under which this affidavit was prepared and executed. In particular, Davis's

affidavit is silent regarding any further contact that he or his representatives may have had with Bovee after April 2003.

Motions for a new trial based on newly discovered evidence "are looked upon with disfavor." United States v. Liebo, 923 F.2d 1308, 1313 (8th Cir. 1991) (quoting United States v. Gustafson, 728 F.2d 1078, 1084 (8th Cir 1984)).

> Five pre-requisites must be met in order to justify a new trial based upon newly discovered evidence: "(1) the evidence must in fact be newly discovered, that is, discovered since the trial; (2) facts must be alleged from which the court may infer diligence on the part of the movant; (3) the evidence relied upon must not be merely cumulative or impeaching; (4) it must be material to the issues involved; and (5) it must be of such nature that, on a new trial, the newly discovered evidence would probably produce an acquittal."

United States v. Womack, 191 F.3d 879, 886 (8th Cir. 1999) (quoting United States v. Luna, 94 F.3d 1156, 1161 (8th Cir.1996). Newly discovered evidence that is not credible is not likely to result in acquittal in a second trial, and therefore lack of credibility is sufficient grounds for denying a motion for a new trial. United States v. Vazquez-Garcia, 340 F.3d 632, 641 (8th Cir. 2003), cert. denied, 540 U.S. 1168 (2004).

Davis argues that his motion for new trial should be judged by a more lenient standard that applies when the government has knowingly, recklessly, or negligently used false testimony, and that he should only be required to show "any reasonable likelihood that the false testimony could have affected the judgment of the jury." See United States v. Tierney, 947 F.2d 845, 860-61 (8th Cir. 1991) (quoting United States v. Agurs, 427 U.S. 97, 103 (1976)). Davis, however, has failed to show that there was any prosecutorial misconduct in the handling of his case. Davis only argues that the prosecutor should have known that Robson's and Negethon's testimony was untruthful because

> . . . both parties testified pursuant to a "cooperating agreement." Robson admittedly used methamphetamine for over a decade and had been arrested several times. [Tr. 1699-1700]. Robson was bi-polar and was using powerful psychiatric medication at the time of his testimony. [Tr. 1618-1620]. Robson even admitted a long history of lying. [Tr. 1700-1704]. Negethon also admitted to being an addict of methamphetamine. [Tr. 1864]. Negethon admitted that she had lied to police regarding Defendant's case. [Tr. 1949]. Negethon even obtained a signed statement from her brother, Osborn, which she later testified was a lie. [Tr. 1926-28].

(Filing 395 at 13.) These facts, all of which were made known to the jury, do not indicate that Robson and Negethon provided any false testimony — at best, they indicate that these witnesses had an incentive or a propensity to lie, but this is hardly unusual in a case of this type. (Indeed, the jury was specifically instructed to consider factors such as these in deciding whether to believe the witnesses and how much weight to give their testimony. See Instruction No. 5 (filing 194 at 6).)

Nor is there any other credible evidence to establish that Robson and Negethon provided false testimony. Bovee's unexplained affidavit has no probative value after his complete disavowal of the earlier written statement, and Davis's other potential new witness, Trowbridge, has likewise denied making the statements that Davis has attributed to him. Also, as will be discussed subsequently, Winkler's report does not establish that Negethon or others provided false testimony regarding the shooting incident. Thus, even if the <u>Tierney</u> standard might be applied in this case, Davis has not provided the requisite degree of evidence for granting a new trial.

Judged by the usual five-part standard, Bovee's affidavit does not satisfy either the third or the fifth prerequisite for granting a new trial. The affidavit fails the third prerequisite because it merely impeaches Robson's and Negethon's testimony. It fails the fifth prerequisite because, first of all, the affidavit is not credible given Bovee's claims

15

that he previously was threatened by Davis to make a similar statement that was not true, and, secondly, there is substantial evidence of Davis's guilt, making it unlikely that the information contained in the affidavit, even if believed, would result in an acquittal on a new trial. The trial testimony concerning methamphetamine quantities attributable to Davis is summarized below.

Glen Groomes testified that he sold a total of six ounces of methamphetamine to Davis. The methamphetamine was fronted to Davis, but he failed to pay. Some of the methamphetamine went through Negethon to Davis. (Tr. 318:9-320:15.) Groomes also bought ⅛-ounce quantities of methamphetamine from Davis on two occasions at Davis's house. (Tr. 323:13-324:13.)

James Smith testified that he started buying methamphetamine from Davis about six months prior to making a wired buy from Davis for the Nebraska State Patrol. He bought methamphetamine from Davis in quantities ranging from ¼ gram to ½ ounce at a time. (Tr. 419:9-420:25.) Smith said that on one occasion, he saw Davis take a smaller quantity that he was buying out of a larger three to four-ounce quantity in Davis's basement. On another occasion, he saw Davis take three or four ⅛-ounce quantities out of a shoe box in the pole building. (Tr. 434:18-436:11.) Smith said that he told Davis that he was reselling some of the methamphetamine he purchased, and Davis was fronting methamphetamine to him. (Tr. 433:7-434:15.) Smith said that on one occasion, he met Robson at Davis's house. They went to a trailer in Grand Island, and Robson came out with two to three ounces of methamphetamine. They then returned to Davis's house. (Tr. 424:17-427:4).

Edgar Anderson testified that he and Davis made three trips to a place that Robson and his girlfriend, Mary Buggi, had near the Platte River and obtained a total of four ounces of methamphetamine together. They would split the methamphetamine obtained between them. Garet Peters put in money on the purchases. Negethon went along on two trips. (Tr. 483:22-485:17; 485:18-486:23; 488:6- 492:22.)

16

After developing a different source, Anderson said he sold at least one ounce of methamphetamine per week to Davis between January and April of 2000. (Tr. 514:7-11; 514:23-515:11.) Beginning in the fall of 2000, Anderson said he obtained ⅛ ounce of methamphetamine fronted to him by Davis nearly every day. Anderson said that on more than one occasion, he saw Davis take his ⅛-ounce quantities out of a bag with several additional ⅛-ounce quantities inside. On at least one occasion, Anderson said he saw Davis cut his ⅛-ounce quantity off of a one-ounce rock of methamphetamine. (Tr. 523:14-525:18.)

Christy Stairs testified that in October of 2000, she went to Grand Island with Davis and Robson. She said Robson went into a residence and came out with two packages of methamphetamine that were the size of house bricks. The three of them did some of the methamphetamine together. When they got back to Davis's house, Davis and Robson went downstairs. (Tr. 772:5-776:1.)

In early November of 2000, Stairs made a second trip to Grand Island with Robson and they brought back another brick of methamphetamine. Davis provided money to Robson prior to them leaving for Grand Island. Stairs said that Davis and Robson would split the methamphetamine obtained between them. She described them as partners. (Tr. 778:10-783:12.)

Stairs made a third trip to Grand Island with Robson prior to Thanksgiving in 2000. On that trip, Robson brought back three bricks of methamphetamine. (Tr. 795:11-797:3.) Stairs lived at Davis's residence between October and December 6, 2000. During that time, Robson made three or four other trips to Grand Island without her. Stairs said she saw Robson come back to Davis's residence with three or four bricks that were half the size of the other bricks she had seen. (Tr. 810:21-815:4.)

Mark Osborn said that he successfully cooked methamphetamine with Davis on three occasions. Each time they produce ¾ ounce of methamphetamine. (Tr. 915:12-916:20.)

17

Garet Peters testified that between 1998 and the spring of 2001, he purchased an estimated fifty ⅛-ounce quantities of methamphetamine from Davis, occasionally buying two ⅛-ounce quantities at a time. On a couple of occasions, he purchased ½-ounce quantities. (Tr. 1480:8-1484:9.) Peters said that on one occasion, he saw Davis break his purchase off of a chunk of methamphetamine that he described as half the size of a bread pan. On four or five occasions Peters also saw Davis in possession of chunks of methamphetamine that were the size of golf balls. He estimated that these golf ball-size chunks weighed one ounce each. (Tr. 1491:4-1494:8). Peters also saw Davis throw an estimated ½-ounce package to Donald Cramer (Hawk) on one occasion. (Tr. 1496:3-1497:21).

Robson testified that there were at least two one-ounce transactions at the Platte River and at least two one-ounce transactions in Columbus with Mary Buggi. (Tr. 1623:23-1625:16; 1626:3-1627:16). With respect to trips to Grand Island, Robson testified that he got methamphetamine from a guy he worked with eight to ten times in quantities ranging from one to three-and-one-half ounces. Robson said that the methamphetamine and the cost of the methamphetamine were split 50-50 with Davis. (Tr. 1629:11-1632:21; 1633:7-1634:7.)

Robson said that he and Davis then obtained methamphetamine from "Hector" for about eight months, starting with two-ounce quantities and progressing up to half-pounds, pounds, and on one occasion, two pounds. (Tr. 1636:5-7; 1637:1-1642:14.) Again, these amounts were split 50-50 with Davis. (Tr. 1643:5-17.) Robson said they got one-pound quantities four to six times. (Tr. 1644:2-7.) He said the methamphetamine looked like it had been formed in a rectangular pie pan or something that banana bread would be baked in. (Tr. 1644:8-1645:25.)

Negethon testified that on one occasion she saw Davis come back from Grand Island with a ½-pound brick. She knew the brick weighed ½ pound, because they weighed it together. (Tr. 1846:6-1847:24.) Negethon said the most she saw Davis with at one time was the ½-pound or slightly more than ½-pound brick. (Tr. 1854:17-20.) She said that

18

Robson dropped off methamphetamine at Davis's house, but she did not see the quantities. (Tr. 1849:16-1850:11.) She heard Davis and Robson talk about getting one to two bricks at a time. (Tr. 1854:24-1855:6.) She said that Davis and Robson were each supposed to get eight ounces from the pound, but she said that Davis's brick weighed out at 8.9 ounces. She understood that Davis and Robson had obtained slightly over one pound together on that occasion. (Tr. 1855:7-1856:12.)

Negethon also saw Davis in possession of two ounces on a daily basis for a couple of months and saw two ounces in a box in the shop. (Tr. 1851:22-1854:14). After Negethon bonded out in December of 2000, Davis told her the State Patrol had missed two ounces in the search of the shop. (Tr. 1903:8-1904:20.)

Even discounting Robson's and Negethon's testimony, there is sufficient evidence to support the jury's finding that Davis was responsible for 500 grams or more of the methamphetamine that was involved in the conspiracy. To the extent Davis argues that an excessive sentence was imposed based upon the court's own finding that Davis was responsible for approximately 10 kilograms of methamphetamine, such argument is irrelevant to the pending motion for new trial. See United States v. Freeman, 942 F.2d 480, 483 (8th Cir. 1991) (newly discovered evidence must be of such a nature that, on a new trial, it would probably produce an acquittal; recent decision of Court of Appeals regarding computation of amount of marijuana for purposes of sentencing was not "newly discovered evidence" entitling defendant to a new trial because it did not render any trial evidence inadmissible and would not result in an acquittal). If Davis wishes to make such an argument, he should file a motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255.

Regarding Winkler's report, even if it might be considered newly discovered evidence, there is no support for his conclusion that "the shooting could not have happened as witnesses described." The investigator apparently believed that the witnesses said the shooting only took place on the front porch of Davis's house, but this is not what was testified to at trial. Negethon testified that she was inside the house

19

during the shooting; that she heard three or four shots while standing in the kitchen; and that she then went to the door and saw the last shot hit two feet behind the car. (Tr. 1917;1-21.) Negethon did not testify that Davis was only shooting from the front porch. In fact, she specifically stated that she could not see where Davis was when she heard the first shots, but her perception was that he was on the side of the house. (Tr. 1984:3-16.) Osborn only testified that he saw Davis "coming down the steps from his front door of his house" and then raise a gun and fire shots at Osborn's car. (Tr. 949:11-15.) Another witness to the shooting, Lawrence Hilliman testified that he followed Davis outside and saw him fire two shots behind the car from one side of the house and then walk to the other side of the house, where he fired one more shot behind the car. (Tr. 1599:14-1600:13.) Davis himself effectively admitted to Sheriff Radcliff that he had fired shots in the direction of Osborn's car. (Tr. 1142:12-1143:1; 1149:5-8). Whether any shots actually hit the car is immaterial to the criminal charges upon which Davis was convicted.

Winkler further concludes that Osborn could not have been struck in the leg by a bullet fragment, but this opinion, even if it might be shown to be admissible, also is not inconsistent with the trial testimony. Osborn merely testified that he felt a burn on his leg while Davis was shooting at him, but "didn't pay any attention to it really," and admitted that the burn could have been caused by a cigarette. (Tr. 954:4-18.)

Absent exceptional circumstances, a motion for new trial based on newly discovered evidence may be decided on affidavits without a hearing. United States v. Dogskin, 265 F.3d 682, 687 (8th Cir. 2001). No exceptional circumstances exist in this case, and Davis's affidavits fail as a matter of law to establish his entitlement to a new trial. The alleged "newly discovered evidence" is merely impeaching or cumulative in nature and would not likely result in an acquittal.

(Filing 404, at 2-15 (footnotes and subheadings omitted).)

20

## II.  DISCUSSION

Most of Davis's 68-page motion (plus 91-page appendix) is devoted to attacking the credibility of the witnesses for the prosecution.  I will take up his six claims in the order that they are presented in the motion.

### *(1) Ineffective Assistance of Counsel at Trial*

In order to prevail on a claim of ineffective assistance of counsel, Davis must show (1) that "counsel's representation fell below an objective standard of reasonableness," and (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different." *Nguyen v. United States*, 114 F.3d 699,  703-04 (8th Cir. 1997) (quoting *Strickland v. Washington,* 466 U.S. 668, 688, 694 (1984)).  The court need not address both components if the movant makes an insufficient showing on one of the prongs.  *Engelen v. United States*, 68 F.3d 238, 240 (8th Cir. 1995) (affirming denial of § 2255 motion without a hearing in the face of an ineffective assistance of counsel claim; stating that no evidentiary hearing is required where "(1) the petitioner's allegations, accepted as true, would not entitle the petitioner to relief, or (2) the allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact.").

Davis claims that he received ineffective assistance of counsel at trial because his attorneys did not discredit Mark Osborn, who testified that he found bullet holes in the rear of his vehicle after being shot at by Davis on July 24, 2001, and that on another occasion Davis had accused him of being a snitch.[9]  Davis maintains that his

---

[9] Osborn also testified that Davis had threatened to kill Osborn's five-year-old daughter, but the jury was instructed that it could consider this evidence only with regard to Count I of the superseding indictment (methamphetamine conspiracy), and not with regard to Count II (witness tampering) or Count III (firearm offense).

attorneys should have done more to prove that Osborn made the bullet holes himself and to show that the shooting incident was not related to drug dealing.

Davis first complains that his attorneys did not hire a forensic ballistics expert to prove that the bullet holes were not made by Davis's rifle. He argues that "[a]n expert could have demonstrated that bullets fired outside the door of Davis' home could not strike a car traveling south due to the layout of Davis' farm." (Filing 451 at 32.) However, as previously discussed in connection with Davis's motion for new trial, two witnesses testified that Davis was shooting at the car from other locations. Davis also argues that "if the composition of the bullet fragments exumed [sic] from Osborn's car did not match the ammunition seized from Davis' house then there would have been adequate proof Davis did not shoot Osborn's car, thus Osborn was untruthful." (*Id.*)

Davis's attorneys argued to the jury that Osborn could have made the bullet holes himself, but Davis contends that the argument was ineffective without any physical evidence to support it. In this regard, Davis has filed a discovery motion requesting that a "forensic/ballistic expert, Richard Ernest, [be granted] access to the firearm, bullets, bullet fragments and ammunition seized from Davis' residence." [10] (Filing 452 at 3.) He has also submitted an affidavit of his investigator, John

_____

(Transcript (filing 266) at 936-39.)

[10] The discovery motion also requests "copies of all United States Marshal or United States Attorney records of transfer trips between jail and court facilities involving Gary Bovee, Brian Robson, and Mary Negethon." (Filing 452 at 3.) This aspect of the motion will be discussed below in Section 3. In a separately filed motion (filing 453), Davis indicates that he did not receive a copy of an order entered on February 14, 2007, directing defense counsel to withdraw certain trial exhibits (filing 441), or a copy of an order entered on July 9, 2007, denying an earlier discovery request (filing 450). The clerk of the court will be directed to provide Davis with copies of these orders.

Winkler, which indicates through hearsay that Osborn had access to a rifle of the same caliber as Davis's.

Even assuming that it could be established that the bullet fragments did not match Davis's ammunition, such evidence would not negate the fact that Mary Negethon and Lawrence Hilliman both testified that they saw Davis shooting in the direction of Osborn's vehicle. Neither witness claimed to have seen any bullets strike the vehicle, and, in fact, Hilliman was very specific that Davis was firing into the air, behind the vehicle. Negethon testified that she saw one shot hit the gravel road close behind the vehicle. It was not an essential element of either the witness tampering charge or the firearms charge that Davis actually hit Osborn's vehicle, or, for that matter, that he even intended to hit the vehicle. Davis even admits in his affidavit that he told his attorneys "I did not shoot Osborn's car because I fired shots straight into the air." (Filing 451-2, Appendix A, ¶ 14.) Davis's primary defense against Counts II and III of the superseding indictment was that Osborn had been warned to stay away from Davis's property for reasons that were unrelated to drug trafficking, and that the shooting incident occurred simply because Osborn ignored Davis's warning by repeatedly driving past his house. Davis does not claim that his attorneys were ineffective because they admitted to the jury that shots were fired.

Considering that the jury was informed that the government's testing of the bullet fragments by a tool mark expert failed to establish that the bullet fragments had been fired from Davis's rifle, that an eyewitness to the shooting swore that Davis was shooting above and behind Osborn's car, and that another eyewitness did not see any shots hit the car, it was objectively reasonable for Davis's attorneys to conclude that further testing was not indicated. Even if material composition testing might have shown that ammunition seized from Davis's house did not match the bullet fragments, such evidence would *not* rule out the possibility that Davis had other ammunition that was used. Davis's arrest and the search of his residence did not take place until two days after the shooting.

23

In summary, I conclude that defense counsels' failure to retain a forensic ballistics expert was objectively reasonable under all of the circumstances. Davis's motion to conduct discovery related to this claim will be denied.

Davis also claims that his attorneys were ineffective because they failed to convince the jury that the shooting was not done in order to prevent Osborn from becoming a witness against Davis. In support of this claim, Davis cites to various portions of the trial transcript for the purpose of establishing that he warned Osborn to stay away from his property in early 2000 after Osborn stole some tools from Davis and slashed the tires on his trailer. Davis contends this proves that Osborn lied about Davis later accusing him of being a snitch because this confrontation allegedly took place in the driveway at Davis's farm. He complains that his attorneys failed to present additional evidence showing that Osborn had prior convictions for theft and that Davis's father had filed police reports against Osborn. Davis also complains that his attorneys failed to establish that the date of his alleged confrontation with Osborn was in June or July of 2001, according to testimony that Osborn gave in state court proceedings.

Although defense counsel did not argue dates to the jury, the failure to do so was not objectively unreasonable and there is no reasonable probability that such an argument would have changed the result; indeed, it likely would have been counterproductive to emphasize that the "snitch" incident allegedly occurred shortly before the shooting, but that the theft and tire slashing took place more than a year earlier. Presenting additional evidence showing that Osborn was a thief also would not have changed the trial outcome. The fact that Osborn was a thief, and that Davis had warned him to stay away following the tire slashing incident was established by Mary Negethon's testimony.

24

## *(2) Ineffective Assistance of Counsel at Sentencing*

Davis next complains that his attorneys failed to make a convincing objection to the drug quantity (9.56 kilograms of methamphetamine) that was attributed to him in the presentence investigation report.  In this regard, Davis's attorneys filed a written objection arguing that "witnesses called by the AUSA provided contradictory testimony, and were motivated by self-serving interest[,]" and that "Davis should not be punished beyond what the jury's verdict reaches, which would be 500 grams to 1500 grams."  (Filing 235, ¶ 1.)  This objection was taken up by the court at the sentencing hearing and, following argument, was denied.  (Transcript (filing 272) at 2138:24-2147:13.)

On appeal, Davis "argue[d] that the district court erred in relying upon the testimony of cooperating witnesses to calculate the amount of drugs involved in the conspiracy."  *Davis*, 357 F.3d at 729.  The Court of Appeals found no reversible error "[b]ecause the testimony of the witnesses believed by the court to be credible is sufficient to support the district court's determination that Davis was responsible for a minimum of 10 kilograms of methamphetamine, ...."  *Id.*

In his § 2255 motion, Davis again argues that the drug quantity finding was erroneous, and he claims that "there is a strong likelihood that the district court would have arrived at a quantity finding far less than what Davis actually received" if only his attorneys had presented a more extensive and detailed argument demonstrating that Robson's testimony was unreliable.[11]  (Filing 451 at 34.)  I can assure Davis that the court is not that easily swayed by lawyers' oratory or briefing, and that the drug quantity finding was based on careful consideration of all of the evidence that was presented at trial.  Because I was there, I also know that Davis's attorneys performed

---

[11] Davis presents in his motion the type of argument that he claims his attorneys should have made at the time of sentencing.  (Filing 451 at 35-41.)

their duties at the sentencing hearing in a very competent and professional manner. This claim of ineffective assistance of counsel has no merit.

### (3) *Bovee's Affidavit*

For his third claim, Davis requests the court to reconsider its finding that the affidavit he obtained from Gary Bovee, and presented in support of his motion for new trial, was not credible. "Davis asks the Court to reconsider in light of evidence unavailable during the Rule 33 proceedings and evidence that Davis' lawyers did not present on that motion." (Filing 451 at 44.) Davis is no longer requesting that he be granted a new trial based on Bovee's affidavit,[12] but, rather, that he be resentenced because "[w]ith this new evidence in hand, it will become clear that the Court used unreliable allegations from Mary Negethon and Brian Robson to substantially increase Davis' guideline sentencing range." (*Id.*)

Davis denies threatening Bovee and explains that the affidavit was prepared for Bovee's signature by an attorney whom Davis's father hired in October 2005 for this purpose. Davis knew at the time that Bovee had asked to be placed in protective custody and transferred to a different prison after his encounter with Davis at FCI Pekin on April 20, 2003, but he was unaware of Bovee's letter to the court until he received the order denying his motion for new trial. Davis states that his father's attorney was unwilling to interview Bovee again without receiving further payment.

---

[12] Davis's motion for new trial based on Bovee's affidavit was filed at the last possible moment, exactly three years after the jury returned its guilty verdict. *See* Fed. R. Crim. P. 33(b)(1) ("Any motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty. If an appeal is pending, the court may not grant a motion for a new trial until the appellate court remands the case."). When the motion for new trial was denied, Davis filed a notice of appeal. However, that appeal was voluntarily dismissed on March 29, 2006, one day before the Court of Appeals issued its decision in Davis's direct appeal on remand from the Supreme Court.

However, Davis has submitted corroborating affidavits of two other inmates at FCI Pekin, Shon Hopwood and Roger Gerth.  Both affidavits were executed on April 12, 2005, about eight months before Davis's motion for new trial was filed.

Hopwood states that he accompanied Davis to Bovee's cell on April 20, 2003, where Bovee admitted that he did not know Davis and said that he was paid $1,000 by Robson to corroborate Robson's testimony.  Bovee also reportedly stated that he received letters and photos from Robson and Negethon containing information to assist with his testimony, and that information was also supplied by Mark Osborn.  (Filing 451-2, Appendix F.)  Gerth states that Bovee admitted to him in a subsequent conversation on April 20, 2003, that he lied to the United States Attorney about his involvement with Davis, that he had never met Davis before that day, and that he would not sign an affidavit for Davis because he was worried about losing a sentence reduction that he had received for cooperating with the government.  (Filing 451-2, Appendix G.)

I am not persuaded by this additional evidence that Bovee's affidavit should be considered truthful.  Frankly, even if Bovee were to testify that he lied about Davis threatening to kill him if he did not sign an affidavit, I would not believe him.  Trial testimony established that Davis has a history of threatening people and of using violence.  Also, while Davis was in jail he had Negethon obtain a signed statement from Osborn disavowing the shooting incident, and in post-trial motions Davis has presented inconsistent versions of statements that David Trowbridge allegedly made to Davis's private investigator concerning Bovee.  Because Davis cannot establish through Bovee that the court's drug quantity finding at sentencing was based on unreliable testimony, there is no need to proceed any further with this claim, and no evidentiary hearing will be granted.  Davis's request for discovery of prisoner transfer records concerning Bovee, Robson, and Negethon also will be denied.

27

### *(4) Sentencing Factors*

Davis next argues that I failed to consider relevant sentencing factors under 18 U. S. C. § 3553(a) and did not provide a sufficient statement of reasons for the sentence that was imposed.  I find nothing new in this argument that requires any further discussion.  Davis's sentencing has been reviewed twice by the Court of Appeals and determined to be proper.

### *(5) Sixth Amendment*

For his fifth claim, Davis argues that there were *Booker* errors at sentencing because the jury was not asked to determine a precise drug quantity (beyond the statutory sentencing threshold of 500 grams of methamphetamine), his role in the offense, or whether he obstructed justice.  This claim fails because *Booker* does not to apply retroactively to cases on collateral review, *see Never Misses A Shot v. United States*,  413 F.3d 781, 783 (8th Cir. 2005), and the Court of Appeals has already addressed the claimed *Booker* error concerning drug quantity.

### *(6) Ineffective Assistance of Counsel on Appeal*

Finally, Davis complains that the attorney whom the Eighth Circuit appointed to represent him on appeal, following the Supreme Court's remand, "did not clearly articulate that reasonableness review [by the Court of Appeals] in itself made Davis' sentence unconstitutional [under the Sixth Amendment]."  (Filing 451 at 66.)  As I understand this claim, Davis is contending that his attorney should have made an as-applied constitutional challenge of the type envisioned by Justice Scalia in his concurring opinion in *Rita v. United States*, 127 S.Ct. 2456, 2479 (2007), in other words, to argue that Davis's sentence "would not have been upheld but for the existence of a fact found by the sentencing judge and not by the jury." *Gall v. United States*, 128 S.Ct. 586, 603 (2007) (Scalia, J., concurring).  Davis's reliance on

concurring opinions of Justice Scalia as an expression of the holdings of the Supreme Court is misplaced.  While concurring opinions may be helpful, they do not represent the holding of the Supreme Court opinion.  Even assuming that Davis might have prevailed on such an argument, this claim of ineffective assistance of appellate counsel necessarily fails because the Eighth Circuit on remand did not conduct a reasonableness review of Davis's sentence; rather, it reviewed for plain error since no Sixth Amendment claim was preserved at trial.

## III.  CONCLUSION

For the reasons stated, I find no merit to any of Davis's claims.  His § 2255 motion, which includes a request for appointment of counsel and a request for an evidentiary hearing, therefore will be denied in all respects.

IT IS ORDERED that:

1.    Defendant's § 2255 motion (filing 451) is denied in all respects, and a final judgment of dismissal shall be entered by separate document.

2.    Defendant's motion for discovery (filing 452) is denied in all respects.

3.    Defendant's motion for copies of documents (filing 453) is granted, and the Clerk of the court shall send Defendant copies of filings 441 and 450.

February 7, 2008.                          BY THE COURT:

                                                    s/ *Richard G. Kopf*
                                                    United States District Judge

29